D. Jay Ritt, State Bar No. 138661
Tiffany W. Tai, State Bar No. 193271
RITT, TAI, THVEDT & HODGES, LLP
65 North Raymond Avenue, Suite 320
Pasadena, California 91103
Tel:   (626) 685-2550
Fax:   (626) 685-2562
E-mail: ritt@rtthlaw.com
       tai@rtthlaw.com

Attorneys for Defendant LOS ANGELES
   TIMES COMMUNICATIONS LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| **REUBEN NATHAN,** individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**LOS ANGELES TIMES COMMUNICATIONS, LLC**, a Delaware limited liability company,<br><br>Defendant. | Case No. 8:19-cv-02435-DOB-JDE<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO STAY** |

Defendant Los Angeles Times Communications LLC ("LA Times") by and through its undersigned counsel, hereby moves this Court for an order staying this action pending rulings from the Federal Communication Commission ("FCC") regarding the definition of an "automatic telephone dialing system" ("ATDS") under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*. and the pending resolution of the Supreme Court's decision in *Am. Ass'n of Political Consultants, Inc. v. FCC*, 923 F.3d 159 (4th Cir. 2019), *cert. granted*, (U.S. Jan. 10, 2020) (No. 19-631) ("AAPC"), as follows:

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................2

CERTIFICATE OF CONFERENCE ..............................................................8

I.      INTRODUCTION........................................................................................9

II.     BACKGROUND.......................................................................................10

        A.      Plaintiff must prove that Defendant used an ATDS to call his cell

                phone. ...........................................................................................10

        B.      After *ACA International,* the FCC requested public comment on the

                definition of an ATDS...................................................................11

        C.      Courts have inconsistently interpreted the definition of an ATDS. ...13

III.    THIS COURT SHOULD ENTER A STAY UNDER THE PRIMARY

        JURISDICTION DOCTRINE.....................................................................17

        A.      This Court should exercise its inherent discretion to stay this case. ..17

        B.      A stay is warranted under the primary jurisdiction doctrine. .............17

        1.      THE FCC WILL DECIDE A DISPOSITIVE ISSUE IN THIS CASE

                AND UNDOUBTEDLY AID THIS LITIGATION. ....................................19

        2.      THE ISSUES RAISED BY THE REQUEST FOR COMMENT ARE

                UNIQUE AND SQUARELY WITHIN THE FCC'S JURISDICTION TO

                ADMINISTER AND INTERPRET THE TCPA........................................20

        3.      THE FCC IS LIKELY TO CLARIFY A CENTRAL DISPOSITIVE

                QUESTION IN THIS CASE SOON.............................................................20

IV.     THIS COURT SHOULD ALSO ENTER A STAY PENDING

        RESOLUTION OF THE SUPREME COURT'S DECISION IN *AAPC*.....21

A.   Legal Standard. ....................................................................21

B.   *AAPC* will have a dispositive effect on Plaintiff's claim. .................22

1.   A STAY WILL CONSERVE JUDICIAL AND PARTY RESOURCES AND PROMOTE AN ORDERLY COURSE OF JUSTICE. ........................................................................22

2.   LA TIMES WILL SUFFER A SIGNIFICANT HARDSHIP IF THE CASE IS NOT STAYED. ...........................................................23

3.   PLAINTIFF WILL NOT SUFFER PREJUDICE FROM A STAY. .23

C.   A petition for certiorari filed by Facebook will have a dispositive effect on Plaintiff's claim. ..............................................................24

V.   CONCLUSION .............................................................25

MOTION TO STAY

1

## <u>TABLE OF AUTHORITIES</u>

2

3 **Cases**

4

5 *ACA Int'l v. Fed. Commc'ns Comm'n*
   885 F.3d 687 (D.C. Cir. 2018)......................................................................passim
6

7 *Am. Ass'n of Political Consultants, Inc. v. FCC*
   923 F.3d 159 (4th Cir. 2019), *cert. granted*, (U.S. Jan. 10, 2020) (No. 19-
8  631)...............................................................................................................passim
9

10 *Am. Home Assurance Co. v. Tutor-Saliba Corp.*
    No. LA CV15-03655 JAK (GJSx), 2015 U.S. Dist. LEXIS 178647 (C.D. Cal.
11  Dec. 2, 2015) ........................................................................................................21
12

13 *Brown v. MCI Worldcom Network Servs., Inc.*
    277 F.3d 1166 (9th Cir. 2002) .............................................................................18
14

15 *Charvat v. EchoStar Satellite*, LLC.
    630 F.3d 459 (6th Cir. 2010) ...............................................................................17
16

17 *Clark v. Time Warner Cable*
    523 F.3d 1110 (9th Cir. 2008) .............................................................................17
18

19

20 *CMAX, Inc. v. Hall*
    300 F.2d 265 (9th Cir. 1962) ..................................................................21, 22, 23
21

22 *Dominguez v. Yahoo*, *Inc.*
    894 F.3d 116 (3d Cir. 2018) ..........................................................................11, 12
23

24

25 *Duguid v. Facebook, Inc.*
    926 F.3d 1146 (9th Cir. 2019), *petition for cert. filed*, (U.S. Oct. 17, 2019) (No.
26  19-511).................................................................................................................25

27

28

4

*Free Conferencing Corp. v. T-Mobile US, Inc.*
  No. 2:14-cv-07113-ODW (SHx), 2014 U.S. Dist. LEXIS 178713 (C.D. Cal.
  Dec. 30, 2014) ............................................................................................... 17

*Fried v. Sensia Salon, Inc.*
  No. 4:13-cv-00312, 2013 U.S. Dist. LEXIS 168645 (S.D. Tex. Nov. 27, 2013) 20

*Gadelhak v. AT&T Servs.*
  No. 19-1738 (7th Cir. Feb. 19, 2020) ............................................................ 14, 15

*Galvez v. Touch-Tel U.S.A, L.P.*
  No. CV 08-05642-RGK (JCx), 2009 U.S. Dist. LEXIS 139643 (C.D. Cal. Mar.
  16, 2009) ........................................................................................................ 19

*Gentry v. Cellco P'Ship*
  No. CV 05-7888 GAF (VBKx), 2006 U.S. Dist. LEXIS 97876 (C.D. Cal. Mar.
  21, 2006) .................................................................................................... 16, 20

*Glasser v. Hilton Grand Vacations Co., LLC*
  Nos. 18-14499, 18-14586, 2020 U.S. App. LEXIS 2481 (11th Cir. Jan. 27,
  2020) .......................................................................................................... 13, 14

*In re Portfolio Recovery Associates, LLC*
  No. 11-md-2295, 2014 U.S. Dist. LEXIS 197094 (S.D. Cal. May 19, 2014) ..... 17

*Kan. City S. Ry. Co. v. United States*
  282 U.S. 760 (1931) ....................................................................................... 16

*King v. Time Warner Cable Inc.*
  894 F.3d 473 (2d Cir. 2018) .................................................................. 11, 12, 13

*Landis v. N. Am. Co.*
  299 U.S. 248 (1936) ................................................................................... 16, 21

*Leyva v. Certified Grocers of Cal., Ltd.*
  593 F.2d 857 (9th Cir. 1979) .......................................................................... 21

*Lipton v. MCI Worldcom, Inc.*
  135 F. Supp. 2d 182 (D.D.C. 2001)................................................................19

*Marks v. Crunch San Diego, LLC*
  904 F.3d 1041 (9th Cir. 2018) ..................................................11, 12, 13, 14

*Matlock v. United Healthcare Servs.*
  No. 2:13-cv-02206-MCE-EFB, 2019 U.S. Dist. LEXIS 65149 (E.D. Cal. Apr.
  15, 2019) ...............................................................................................17, 20

*Meyer v. Portfolio Recovery Assocs., LLC*
  707 F.3d 1036 (9th Cir. 2012) ................................................................7

*Miss. Power & Light Co. v. United Gas Pipe Line*
  532 F.2d 412 (5th Cir. 1976) ..................................................................20

*Pour v. Ocwen Mortg. Servicing, Inc.*
  No. LA CV17-04141 JAK (ASx), 2017 U.S. Dist. LEXIS 184782 (C.D. Cal.
  Nov. 7, 2017) .......................................................................................16

*Rivers v. Walt Disney Co.*
  980 F. Supp. 1358 (C.D. Cal. 1997) ........................................................16

*Roadtrek Motorhomes v. Mega RV Corp.*
  No. CV 09-09466 SJO (MLGx), 2010 U.S. Dist. LEXIS 151011 (C.D. Cal. July
  29, 2010) ...............................................................................................18

*United States v. Dish Network, LLC*
  No. 09-3073, 2011 U.S. Dist. LEXIS 10943 (C.D. Ill. Feb. 4, 2011)..................17

*United States v. Gen. Dynamics Corp.*
  828 F.2d 1356 (9th Cir. 1987) ................................................................16

MOTION TO STAY

1

**Statutes**

2

47 U.S.C. § 227 ............................................................................................. passim

3

4

**Other Authorities**

5

6

Consumer and Governmental Affairs Bureau Seeks Further Comment on
   Interpretation of the Telephone Consumer Protection Act in Light of the Ninth
   Circuit's *Marks v. Church San Diego, LLC* Decision, Docket No. 02-278 (Oct.
   3, 2018) ........................................................................................................... 11

7

8

9

FCC Public Notice, "Consumer and Governmental Affairs Bureau Seeks
   Comment on Interpretation of the Telephone Consumer Protection Act in Light
   of the D.C. Circuit's ACA International Decision," CG Docket Nos. 18-152, 02-
   278 (May 14, 2018) ..................................................................................... passim

10

11

12

13

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,
   Report and Order,* 27 FCC Rcd 1830 (Feb. 15, 2012) ......................................... 8

14

15

*See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
   *Report and Order*, 30 FCC Rcd. 7961 (2015) ....................................... 8, 9, 11, 12

16

17

18

**Constitutional Provisions**

19

U.S. CONST. amend. I ................................................................................. 6, 22, 25

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7-3, a conference of counsel was held on February 6, 2020, between William Raney, counsel for the moving party, and Patrick Peluso, counsel for Plaintiff, whereby the basis for this motion was discussed. Plaintiff opposes the motion to stay.

*/s/ William E. Raney*

WILLIAM E. RANEY

MOTION TO STAY

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

"[W]hat constitutes an 'automatic telephone dialing system?'"[1] The FCC asked this question in its May 14, 2018 Request for Comment, which came shortly after the D.C. Circuit's decision in *ACA International v. Fed. Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018). Although Defendant believes the calls at issue in this action were not sent using an ATDS under any standard, the definition has been left in doubt since the *ACA International* ruling. That case vacated the FCC's prior rulings regarding the definition of an ATDS, but failed to promulgate a new standard causing courts to split over the scope and impact of its ruling and prompted the FCC to issue the Request for Comment, in which the FCC indicated that it will clarify the scope and nature of an ATDS.

Not only does the FCC have the expertise to determine the scope and nature of an ATDS under the TCPA, but Congress granted the FCC the authority to resolve issues regarding the implementation and enforcement of the TCPA. A decision by the FCC providing guidance on the definition of an ATDS will have a significant, and potentially dispositive, impact on this case. While the FCC's comment period concluded on October 24, 2018, the FCC has not yet released its findings or a decision. Thus, a forthcoming ruling by the FCC warrants a stay under the primary jurisdiction doctrine.

This Court should also enter a stay pending resolution of the Supreme Court's decision in *AAPC*. The Supreme Court's opinion will decide a legal question potentially dispositive of this action: whether the TCPA's automated-call prohibition is an unconstitutional content-based restriction of speech that violates

---

[1] FCC Public Notice, "Consumer and Governmental Affairs Bureau Seeks Comment on Interpretation of the Telephone Consumer Protection Act in Light of the D.C. Circuit's ACA International Decision," CG Docket Nos. 18-152, 02-278 (May 14, 2018) ("FCC's Request for Comment")

the First Amendment. *See* 47 U.S.C. 227(b)(1)(a)(iii). This is the exact same provision of the TCPA under which Plaintiff brings his class action claim against LA Times.

## I.   BACKGROUND

### A.   Plaintiff Must Prove That Defendant Used An ATDS To Call His Cell Phone

Plaintiff Reuben Nathan ("Plaintiff") alleges in his complaint that he received an "autodialed call to his cellphone on or about October 8, 2019" without prior express consent from LA Times in violation of the TCPA.  Compl., Dkt. No. 1, ¶¶ 22-23, 33.  Based on this allegation, Plaintiff seeks to represent a class of:

> All persons in the United States who (1) from the date four years prior to the filing of this Complaint through the date notice is sent to the Class; (2) Defendant caused to be called; (3) on the person's cellphone; (4) for the same purpose as Defendant called Plaintiff; (5) using the same equipment that was used to call the Plaintiff, and (6) for whom Defendant claims it obtained prior express consent in the same manner as Defendant claims it obtained prior express consent to call the Plaintiff.

*Id*. at ¶ 33.

To maintain his claim, Plaintiff must establish that the device used to make the call is an ATDS under the TCPA. The TCPA makes it unlawful for a person "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or prerecorded voice … to any telephone number assigned to a … cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii).

Therefore, to state a claim under the TCPA, a plaintiff must allege that (1) the defendant made a call to a cell phone, (2) by the use of an ATDS or an artificial or recorded voice, and (3) without the prior express consent of the called party. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th

Cir. 2012). The FCC has concluded that "calls" include "both voice and text calls, including short message service (SMS) calls, if the prerecorded call is made to a telephone number assigned to such service." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, Report and Order,* 27 FCC Rcd 1830, 1832 (Feb. 15, 2012).

Accordingly, in this case, a central dispositive question will be whether Defendant used an ATDS, which will require this Court to determine exactly what constitutes an ATDS. Further, to the extent Plaintiff's proposed class contains individuals who received calls from some other combination of equipment and software, the ATDS standard will pose significant class certification and aggregate proof issues.

**B.** **After ACA *International,* the FCC Requested Public Comment on the Definition of An ATDS**

On March 16, 2018, the D.C. Circuit Court of Appeals issued its opinion in *ACA International* striking down parts of the FCC's 2015 declaratory ruling dealing with the definition of an ATDS. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, *Report and Order*, 30 FCC Rcd. 7961 (2015) ("2015 Order").

In its 2015 Order, the FCC stated that the "capacity" to dial numbers randomly or sequentially "includes … potential functionalities," not just its "present ability." *Id.* at 7974–76. The FCC also reaffirmed that "the basic functions of an autodialer is to dial numbers *without human intervention.*" *Id.* at 7975 (internal quotations omitted) (emphasis added).

However, *ACA International* held that the 2015 Order contained conflicting regulations on this issue—finding a predictive dialing system qualifies as an ATDS, even though some cannot generate random or sequential numbers, while at the same time indicating that a "device must be able to generate and dial random

1  or sequential numbers to meet the TCPA's definition of an autodialer." *Id.* at 694.

2  The Court found that this conflict led to impermissible uncertainty. *Id.* at 703-04

3  ("The 2015 ruling, while speaking to the question in several ways, gives no clear

4  answer (and in fact seems to give both answers) …. the [FCC] cannot, consistent

5  with reasoned decisionmaking, espouse both competing interpretations in the

6  same order.").

7      The Court also set aside the FCC's interpretation of "capacity," observing

8  that "[i]f a device's 'capacity' includes functions that could be added through app

9  downloads and software additions, and if smartphone apps can introduce ATDS

10  functionality into the device, it follows that all smartphones, under the [FCC's]

11  approach, meet the statutory definition of an autodialer." *Id.* at 697. Congress

12  could not have intended hundreds of millions of smartphones and billions of calls

13  to be banned by the TCPA. The Court further found that such an interpretation

14  was "untenable," "incompatible" with the TCPA's statutory purpose and

15  concerns, in excess of the agency's authority, "utterly unreasonable," and

16  "arbitrary and capricious." *Id.* at 698-700.

17      Two months after the D.C. Circuit's ruling, the FCC issued its Request for

18  Comment regarding the interpretation and implementation of the TCPA with

19  initial comments due on June 13, 2018 and reply comments due June 28, 2018. In

20  its Request, the FCC asked the following relevant questions:

21          We seek further comment on the functions a device must be
22  able to perform to qualify as an automatic telephone dialing
   system. Again, the TCPA defines an "*automatic* telephone
23  dialing system" as "equipment which has the capacity— (A)
   to store or produce telephone numbers to be called, *using a*
24  *random or sequential number generator*; and (B) to dial
   *such numbers*." Regarding the term "automatic," the
25  Commission explained that the "basic function[]" of an
   automatic telephone dialing system is to "dial numbers
26  without human intervention" and yet "declined to 'clarify[]
   that a dialer is not an [automatic telephone dialing system]
27  unless it has the capacity to dial numbers without human
   intervention.'" As the court put it, "[t]hose side-by-side
28  propositions are difficult to square." The court further noted
   the Commission said another basic function was to "dial

12

> thousands of numbers in a short period of time," which left parties "in a significant fog of uncertainty" on how to apply that notation. How "automatic" must dialing be for equipment to qualify as an automatic telephone dialing system? Does the word "automatic" "envision non-manual dialing of telephone numbers?" Must such a system dial numbers without human intervention? Must it dial thousands of numbers in a short period of time? If so, what constitutes a short period of time for these purposes?

Request for Comment at 2–3 (internal citations omitted) (emphasis in original).

On October 3, 2018, the FCC issued a public notice seeking further comment on the ATDS definition in light of the Ninth Circuit's decision in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018) discussed *infra*. *See* Consumer and Governmental Affairs Bureau Seeks Further Comment on Interpretation of the Telephone Consumer Protection Act in Light of the Ninth Circuit's *Marks v. Church San Diego, LLC* Decision, Docket No. 02-278 (Oct. 3, 2018). The FCC set a comment deadline of October 17, 2018 and a reply comment deadline of October 24, 2017. *See id*. The questions posed by the FCC, and how the FCC ultimately answers them, are central questions that this Court must answer before rendering a decision in this case.

## C.    **Courts Have Inconsistently Interpreted the Definition of An ATDS**

Post-*ACA International*, the Second, Third, Seventh, Ninth, and Eleventh Circuits have taken diverging views on the ATDS definition. The Second, Third, and Eleventh Circuits agreed with the D.C. Circuit's holding that the definition of an ATDS cannot include a system's potential capacities. *See King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018) ("Although we are not bound by the D.C. Circuit's interpretation of the statute, we are persuaded by its demonstration that interpreting 'capacity' to include a device's 'potential functionalities' after some modifications extends the statute too far."); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018) ("In light of the D.C. Circuit's holding, we interpret

the statutory definition of an autodialer as we did prior to the issuance of 2015 Declaratory Ruling. Dominguez can no longer rely on his argument that the Email SMS Service had the latent or potential capacity to function as autodialer."). Additionally, the Third Circuit expressly stated that random or sequential number generation is required to fit within the statutory ATDS definition, and the Second Circuit appeared to accept that approach. *Id*. at 121 (stating the "key factual question" is "whether the Email SMS System functioned as an autodialer by randomly or sequentially generating telephone numbers, and dialing those numbers"); *see generally King*, 894 F.3d 473.

Despite these holdings, neither court reached the questions of whether the FCC's prior orders regarding predictive dialers remain good law or how the human intervention standard has been affected. *See generally King*, 894 F.3d 473; *Dominguez*, 894 F.3d 116. Indeed, the Second Circuit in *King* expressly highlighted the open questions that remain in the wake of *ACA International* decision. In response to "Time Warner['s] argu[ment] that the district court improperly relied on a 'human involvement' standard that is not reflected in the statute," the court noted that the FCC declined to adopt a standard in its 2015 Order and stated "we venture no opinion on whether that lack of human involvement is a consideration relevant to King's claims." *King*, 894 F.3d at 482.

The Ninth Circuit in *Marks* took a different approach. In *Marks*, the Ninth Circuit held that *ACA International* vacated the prior FCC orders regarding the ATDS definition and, based on the statutory text alone—which it found "not susceptible to a straightforward interpretation"—found that "equipment that ma[kes] automatic calls from lists of recipients [is] also covered by the TCPA." *Marks*, 904 F.3d at 1051. The Ninth Circuit thus departed from the Third Circuit's holding that random or sequential number generation is required for a device to be considered an ATDS and, in fact, read the words "random or sequential number generator" out of the statute. *Id*. at 1052. The Ninth Circuit, differing from the

14

Second Circuit in *King*, also offered its opinion on the human intervention issue, stating that "[w]e also reject Crunch's argument that a device cannot qualify as an ATDS unless it is fully automatic, meaning that it must operate without any human intervention whatsoever" and that the at-issue system "dials numbers automatically, and therefore it has the automatic dialing function necessary to qualify as an ATDS." *Id.* at 1053.

On January 27, 2020, the Eleventh Circuit rejected an attempt by plaintiffs in a consolidated appeal to broaden the reach of the TCPA, specifically as it pertains to the definition of an ATDS. In *Glasser v. Hilton Grand Vacations Co., LLC*, Nos. 18-14499, 18-14586, 2020 U.S. App. LEXIS 2481 (11th Cir. Jan. 27, 2020), the Court held an ATDS, which is expressly defined in the TCPA as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers," should be interpreted as written. In doing so, the Court specifically rejected the "surgery" that the Ninth Circuit performed to reach its sweeping conclusion in *Marks* as to what constitutes an ATDS. *Id.* at *19.

Under *Glasser*, the TCPA's prior consent requirements for autodialers are limited to dialing equipment with the capacity to randomly or sequentially generate numbers. *Id*. at *18-21. The Eleventh Circuit also rejected more recent attempts by the FCC to expand the ATDS definition to encompass predictive dialers and other modern dialing technology, finding that while technology changed, the statute had not. The Court shared the D.C. Circuit's concerns, as expressed in *ACA International*, that the FCC's expansion of the ATDS definition would place smartphones "within the definition's fold," so as to improperly expand the TCPA to encompass "the most ubiquitous type of phone equipment known[.]" *Id*. at *15 (citing *ACA Int'l*, 885 F.3d at 698).

Most recently, on February 19, 2020, the Seventh Circuit also rejected *Marks*' analysis in *Gadelhak v. AT&T Servs.*, No. 19-1738 (7th Cir. Feb. 19, 2020), and held that because AT&T's dialing system neither stores nor produces numbers using a random or sequential number generator but exclusively dials numbers stored in a customer database, it is not an ATDS as defined by the TCPA. *Id*. at p. 2. The Court explained:

> Finally, it is worth noting the far-reaching consequences of Gadelhak's ungrammatical interpretation: it would create liability for every text message sent from an iPhone. That is a sweeping restriction on private consumer conduct that is inconsistent with the statute's narrower focus.

*Id*. at p. 16.  Thus, the unanimous panel followed the plain language of the TCPA and held that a system must store or produce numbers, using a random or sequential number generator, to be an ATDS.

These court rulings demonstrate the risk of conflicting interpretations of the TCPA in the absence of FCC guidance. Some courts have held that *ACA International* rejected the prior FCC orders and that random or sequential number generation is thus a requirement. Others have ruled that *ACA International* left the prior FCC orders intact, meaning predictive dialers, which did not necessarily randomly or sequentially dial numbers, are autodialers. Still other courts have found the prior FCC orders void, but that systems are not required to randomly or sequentially dial numbers to be considered an ATDS. Compounding this confusion is the issue of human intervention and courts' varying standards for what level of human intervention is required to take a system out of the ATDS definition.

A stay is appropriate under the primary jurisdiction doctrine to provide this Court with clarity and to avoid adding to the confusion.

/ / /

/ / /

MOTION TO STAY

**III.    THIS COURT SHOULD ENTER A STAY UNDER THE PRIMARY JURISDICTION DOCTRINE**

    **A.    This Court Should Exercise Its Inherent Discretion to Stay This Case**

    "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). When determining whether to stay a case, courts weigh the competing interests. *Id.* at 255 (citing *Kan. City S. Ry. Co. v. United States*, 282 U.S. 760, 763 (1931)). "A stay is appropriate when it serves the interests of judicial economy and efficiency." *Pour v. Ocwen Mortg. Servicing, Inc.*, No. LA CV17-04141 JAK (ASx), 2017 U.S. Dist. LEXIS 184782, at *7 (C.D. Cal. Nov. 7, 2017) (citing *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997)). The specific factors relevant to whether a stay should be issued under the primary jurisdiction doctrine are set forth below.

    **B.    A Stay is Warranted Under the Primary Jurisdiction Doctrine**

    The Court should defer to the FCC's expertise and stay this case under the primary jurisdiction doctrine. "[P]rimary jurisdiction is properly invoked when a case presents a far-reaching question that 'requires expertise or uniformity in administration.'" *Gentry v. Cellco P'Ship*, No. CV 05-7888 GAF (VBKx), 2006 U.S. Dist. LEXIS 97876, at *8 (C.D. Cal. Mar. 21, 2006) (citing *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987)).

    The FCC here possesses an expertise with which courts may not have. "'Congress vested the FCC with considerable authority to implement the [TCPA]' including the power to 'prescribe regulations to implement the legislation' and 'interpretive authority over the … Act … and its accompanying regulations.'" *Matlock v. United Healthcare Servs.*, No. 2:13-cv-02206-MCE-

1   EFB, 2019 U.S. Dist. LEXIS 65149, at *7 (E.D. Cal. Apr. 15, 2019) (citing

2   *Charvat v. EchoStar Satellite*, *LLC*., 630 F.3d 459, 466-67 (6th Cir. 2010)); *see*

3   *also Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008) (primary

4   jurisdiction doctrine applies to "agencies possessing 'quasi-legislative powers'

5   and are 'actively involved in the administration of regulatory statues' …

6   the FCC is such an agency.").

7       Additionally, "the definition of the term 'capacity' as used in the TCPA is

8   not within the conventional experience of judges but, instead involves technical or

9   policy considerations within the FCC's particular field of expertise." *In re*

10  *Portfolio Recovery Associates, LLC*, No. 11-md-2295, 2014 U.S. Dist. LEXIS

11  197094, at *47–48 (S.D. Cal. May 19, 2014) (staying TCPA case on primary

12  jurisdiction grounds). The FCC has the technical expertise that positions it to best

13  analyze the complicated and ever-changing functionality, capability, and uses

14  associated with the technology at issue. *See Free Conferencing Corp. v. T-Mobile*

15  *US, Inc*., No. 2:14-cv-07113-ODW (SHx), 2014 U.S. Dist. LEXIS 178713, at

16  *18-19 (C.D. Cal. Dec. 30, 2014); *see also United States v. Dish Network, LLC*,

17  No. 09-3073, 2011 U.S. Dist. LEXIS 10943, at *8 (C.D. Ill. Feb. 4, 2011) (staying

18  TCPA-related claims on primary jurisdiction grounds pending FCC proceedings).

19  The FCC's expertise in this technical area favors application of the primary

20  jurisdiction doctrine.

21      In deciding whether the doctrine of primary jurisdiction should apply, the

22  trial court may balance the benefits of administrative expertise with calendaring

23  considerations, the delay to the plaintiff, and the plaintiff's right to jury trial. *See*

24  *Roadtrek Motorhomes v. Mega RV Corp.*, No. CV 09-09466 SJO (MLGx), 2010

25  U.S. Dist. LEXIS 151011, at *9 (C.D. Cal. July 29, 2010).

26      In striking this balance, courts consider factors including: how agency

27  action will aid the litigation; whether the litigation involves conduct requiring

28  continuing supervision by the agency; whether the issues to be litigated are unique

to regulated industries; and whether proceedings already are pending before the agency. *See Brown v. MCI Worldcom Network Servs., Inc.*, 277 F.3d 1166, 1171-72 (9th Cir. 2002). These factors weigh in favor of obtaining the FCC's guidance.

### 1. The FCC Will Decide a Dispositive Issue in This Case and Undoubtedly Aid This Litigation

Action by the FCC will aid this litigation, as it will answer questions that directly impact Plaintiff's allegations against Defendant. As discussed above, the FCC's Request for Comment makes clear that it intends to rule on issues related to the ATDS definition that are at issue in this case. Defendant contends it did not use an ATDS to send the call messages. Plaintiff, however, will certainly contest this position. Although the weight of relevant case law supports a narrow ATDS definition in light of *ACA International*, the FCC's forthcoming guidance will speak squarely to issues that are key to resolving this dispute.

For example, in its Request for Comment, the FCC asked, "How 'automatic' must dialing be for equipment to qualify as an automatic telephone dialing system? Does the word 'automatic' envision non-manual dialing of telephone numbers? Must such a system dial numbers without human intervention?" Request for Comment at 2. Regarding the requirement that an ATDS must "produce telephone numbers to be called, using a random or sequential number generator," the FCC asked: "If equipment cannot itself dial random or sequential numbers, can that equipment be an automatic telephone dialing system?" *Id.* at 2–3. These fundamental questions regarding what constitutes an ATDS will, without a doubt, be contested issues in this litigation.

/ / /
/ / /
/ / /

2.     **The Issues Raised by the Request for Comment are Unique and Squarely Within the FCC's Jurisdiction to Administer and Interpret the TCPA**

The "FCC is the administrative agency that possesses the requisite specialized experience and expertise in the field of telecommunications." *Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 191 (D.D.C. 2001). The equipment at issue here and the applicable definitions are unique to the telecommunications industry. Moreover, Congress "created the FCC for the purpose of regulating the telecommunications industry." *Galvez v. Touch-Tel U.S.A, L.P.*, No. CV 08-05642-RGK (JCx), 2009 U.S. Dist. LEXIS 139643, at *8 (C.D. Cal. Mar. 16, 2009). Given this rapidly changing environment, Congress's legislative authority cannot match the FCC's ability to "respond to changes in the industry through regulations, reports and orders, declaratory rulings, and other available tools." *Fried v. Sensia Salon, Inc.*, No. 4:13-cv-00312, 2013 U.S. Dist. LEXIS 168645, at *16 (S.D. Tex. Nov. 27, 2013). Therefore, the FCC is in a unique position to handle these questions.

3.     **The FCC is Likely to Clarify a Central Dispositive Question in This Case Soon**

More than a year has passed since the FCC closed its comment period seeking input on how to interpret and apply the meaning of ATDS. Thus, the FCC is likely deep in the process of clarifying the issues in this case and close to issuing a ruling. The fact that an issue is already before the FCC "cuts strongly in favor of" invoking primary jurisdiction. *Gentry*, 2006 U.S. Dist. LEXIS 97876, at *22; *see also Miss. Power & Light Co. v. United Gas Pipe Line*, 532 F.2d 412, 420 (5th Cir. 1976) ("The advisability of invoking primary jurisdiction is greatest when the issue is already before the agency."). A petition for a declaratory ruling is before the FCC, the FCC has solicited public comments on the issues, and the

20

comment period has expired. The proceedings before the FCC favor a stay of this action. *See Matlock*, 2019 U.S. Dist. LEXIS 65149, at \*8 (granting a stay on primary jurisdiction grounds because defendant's petition was already before the FCC, and "a continued stay would appear to promote economy and efficiency for both the parties and this Court.").

## IV. THIS COURT SHOULD ALSO ENTER A STAY PENDING RESOLUTION OF THE SUPREME COURT'S DECISION IN *AAPC*

### A. Legal Standard

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Am. Home Assurance Co. v. Tutor-Saliba Corp.*, No. LA CV15-03655 JAK (GJSx), 2015 U.S. Dist. LEXIS 178647, at \*31 (C.D. Cal. Dec. 2, 2015) (citing *Landis*, 299 U.S. at 254). Whether to stay an action is a matter that is within the discretion of a trial court. *Id.* at \*32. Consistent with this discretion, "[a] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979).

In determining whether to grant a stay, the Ninth Circuit instructs district courts to weigh "the competing interests which will be affected by the granting or refusal to grant a stay …." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). These competing interests include: (1) "the orderly course of justice measured in terms of the simplifying or complicating of issues;" (2) "the hardship or inequity which a party may suffer in being required to go forward;" and (3) "the possible damage which may result from the granting of a stay." *CMAX*, 300 F.2d at 268. As explained below, each of the *CMAX* factors weigh heavily in favor of a stay.

### B.    *AAPC* **Will Have a Dispositive Effect on Plaintiff's Claim**

On January 10, 2020, the U.S. Supreme Court granted certiorari in *AAPC*. The Supreme Court's opinion will decide a legal question potentially dispositive of this action: whether the TCPA's automated-call prohibition is an unconstitutional content-based restriction of speech that violates the First Amendment. *See* 47 U.S.C. 227(b)(1)(a)(iii). This is the exact same provision of the TCPA under which Plaintiff brings his class action claim against LA Times.

### 1.    **A Stay Will Conserve Judicial and Party Resources and Promote an Orderly Course of Justice**

The Supreme Court's upcoming decision in *AAPC* will decide, one way or the other, whether Plaintiff can pursue his claim against LA Times. The question presented is directly on point. There is no rational reason to proceed further in this case until the constitutionality of the TCPA has been resolved by the Supreme Court. *AAPC* will provide direct authority on that issue by deciding whether the TCPA's automated-call prohibition is an unconstitutional content-based restriction of speech that violates the First Amendment. Given the impact of *AAPC*, it would be a waste of judicial resources to require the parties to proceed with costly discovery, motion practice, and class certification proceedings. Further, if this case is not stayed, the next six months to a year will absorb a substantial amount of the Court's time and resources on discovery issues, and depending on the case schedule, perhaps even dispositive motions and class certification motions. It would make little sense to undertake the significant expenditures of time, resources and costs to proceed with a purported class action that may ultimately be wiped away with one decision by the Supreme Court. In short, this Court should not spend its time on this case when the eventual decision in *AAPC* could require the dismissal of Plaintiffs' lawsuit.

MOTION TO STAY

### 2.    LA Times Will Suffer a Significant Hardship if The Case is Not Stayed

The next inquiry in the *CMAX* stay analysis is the inevitable hardship LA Times will suffer if this case is not stayed. As described above, if this case is not stayed, LA Times will be required to defend a potentially massive class action with the very real likelihood that the Supreme Court's decision in *AAPC* will render the time and costs of such defense entirely futile.

Plaintiff seeks to represent the following class:

> **Autodialed Class:** All persons in the United States who (1) from the date four years prior to the filing of this Complaint through the date notice is sent to the Class; (2) Defendant caused to be called; (3) on the person's cellphone; (4) for the same purpose as Defendant called Plaintiff; (5) using the same equipment that was used to call the Plaintiff, and (6) for whom Defendant claims it obtained prior express consent in the same manner as Defendant claims it obtained prior express consent to call the Plaintiff.

Compl. ¶ 33.

Plaintiff's own calculation estimates that this number includes "thousands of consumers." *Id*. at ¶ 35. Although LA Times denies Plaintiff's allegations and denies that class treatment is appropriate, if this case is not stayed, LA Times will be forced to begin the herculean effort of defending against Plaintiff's allegations and intent to certify his purported class. Defending a class action of that size will necessarily require LA Times to expend substantial resources. The discovery process alone will be incredibly burdensome. With the strong possibility that *AAPC* may render those efforts moot, LA Times faces significant hardship if this case is not stayed.

### 3.    Plaintiff Will Not Suffer Prejudice From a Stay

Finally, Plaintiff cannot credibly claim prejudice from having to wait slightly longer to pursue his claim, because the case is in its infancy as it was just

MOTION TO STAY

1   filed on December 17, 2019. In fact, LA Times only concurrently filed its answer

2   to the complaint on February 25, 2020, along with this motion to stay.

3        Plaintiff and his counsel cannot have expended significant costs to date. No

4   motions have been filed by either party and no discovery has taken place.

5   Considering the substantial amount of resources that will go into this case in the

6   next six-to-twelve months if not stayed, likely including extensive motion

7   practice, Plaintiff and his counsel could invest significant time and money in a

8   case that ultimately must be dismissed for lack of standing. A short stay to await a

9   precedential ruling is thus in each party's interest.

10

11   **C.**     **A Petition for Certiorari Filed by Facebook Will Have a**

12               **Dispositive Effect on Plaintiff's Claim**

13        On October 17, 2019, social media company Facebook filed a petition for

14   certiorari in *Duguid v. Facebook, Inc.*, 926 F.3d 1146 (9th Cir. 2019), *petition for*

15   *cert. filed*, (U.S. Oct. 17, 2019) (No. 19-511) asking the Supreme Court to review

16   whether the TCPA's automated-call prohibition is an unconstitutional content-

17   based restriction of speech that violates the First Amendment. *See* 47 U.S.C.

18   227(b)(1)(a)(iii). Like *AAPC*, this is the exact same provision of the TCPA under

19   which Plaintiff brings his class action claim against LA Times.

20        While the Supreme Court has not yet ruled on Facebook's petition, the

21   potential outcome of *Duguid* would also effect this case as the question posed is

22   also directly on point. Thus, a motion to stay this case based on the Supreme

23   Court's pending decision to review *Duguid* would conserve judicial and party

24   resources and promote an orderly course of justice and Plaintiff would not suffer

25   prejudice from a stay. LA Times would similarly suffer a significant hardship if

26   the case is not stayed.

27

28

MOTION TO STAY

## V.     **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests the Court stay this action pending the FCC's clarification of the definition of an ATDS, the Supreme Court's pending decision in *AAPC*, and Facebook's pending petition for certiorari.

Respectfully submitted,

DATED:  February 25, 2020          RITT, TAI, THVEDT & HODGES, LLP


*/S/ D. JAY RITT*
_____
D. JAY RITT
TIFFANY W. TAI

William E. Raney (*pro hac vice* to be submitted)
Kellie Mitchell Bubeck (*pro hac vice* to be submitted)
Martin L. McCarthy (*pro hac vice* to be submitted)
COPILEVITZ, LAM & RANEY, P.C.
310 W. 20th Street, Suite 300
Kansas City, MO 64108
Telephone: (816) 472-9000
Facsimile: (816) 472-5000
Email: braney@clrkc.com
          kbubeck@clrkc.com
          mlm@clrkc.com

*Attorneys for Defendant* LOS ANGELES TIMES COMMUNICATIONS, LLC

MOTION TO STAY

## **CERTIFICATE OF SERVICE**

I hereby certify that on **February 25, 2020**, I electronically filed the foregoing **ANSWER OF DEFENDANT LOS ANGELES TIMES COMMUNICATIONS LLC TO PLAINTIFF'S CLASS ACTION COMPLAINT** with the Clerk of the Court using CM/ECF, which sent notification of such filing to all counsel of record, as follows:

Cristian L. Peirano
PEIRANO AND ASSOCIATES, INC.
1616 East 4th Street, Suite 210
Santa Ana, CA 92701-5145
Telephone: (714) 881-5985
Facsimile: (714) 558-4854
Email: ecf@peiranolaw.com

Patrick H. Peluso
Taylor T. Smith
WOODROW AND PELUSO LLC
3900 E. Mexico Avenue, Suite 300
Denver, CO 80210
Telephone: (720) 213-0676
Facsimile: (303) 927-0809
Email: ppeluso@woodrowpeluso.com
        tsmith@woodrowpeluso.com

*Attorneys for Plaintiff* REUBEN NATHAN

Executed this 25th day of February, 2020, at Pasadena, California.

*/s/ Lisa M. Wells*

LISA M. WELLS

26

MOTION TO STAY